UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL SMITH BAKER,

              Plaintiff,

      -v.-

DETECTIVE ANTHONY GERMAN and
DETECTIVE FEDERICO IRIZARRY,

              Defendants.

15 Civ. 7296 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Michael Smith Baker, proceeding *pro se*, brings this civil rights action under 42 U.S.C. § 1983 against Defendants Anthony German and Federico Irizarry, members of the First Precinct Detective Squad of the New York City Police Department (the "NYPD"). Plaintiff alleges that in March 2015, Defendants beat him over the head with a phonebook, pushed him up against a wall, and used excessively tight handcuffs in restraining him. Defendants now move for summary judgment in their favor on all remaining claims. For the reasons stated in this Opinion, Defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND[1]

### A. Factual Background

Defendants' interactions with Plaintiff on March 26, 2015, are at the heart of the instant lawsuit. While Defendants dispute that Plaintiff's version

---

[1]     The facts in this section are drawn from the Declaration of Colin McCann Ceriello ("Ceriello Decl." (Dkt. #67-68)), and the exhibits attached thereto; the Affidavit of Defendant Antonio German ("German Aff." (Dkt. #69)); Plaintiff's deposition testimony ("Pl. Dep." (Dkt. #67, Ex. D)); and Defendants' Local Civil Rule 56.1 Statement of

of events ever *did* happen, the principal focus of their motion for summary judgment is to argue that Plaintiff's version of events *could not have* happened. For this reason, the Court focuses in this section on Plaintiff's testimony regarding his interactions with Defendants, and the record evidence supporting or refuting that testimony.

Defendant Anthony German is a detective assigned to the NYPD's First Precinct Detective Squad in Manhattan. (German Aff. ¶ 1). On March 26, 2015, Plaintiff entered the First Precinct stationhouse after being called in for questioning by German. (*Id.* at ¶ 7; Pl. Dep. 40-41). Plaintiff testified that he met German, waited for a couple of minutes, and was led into an interrogation room, where Defendant Federico Irizarry was seated. (Pl. Dep. 41). According to Plaintiff, German asked him, "Is there something you want to tell us?" (*Id.* at 42). Plaintiff responded, "I have nothing to say … I have nothing to say because I don't have a lawyer present." (*Id.*).

1.   **The First Alleged Excessive Force Incident**

At some point during the interrogation, Plaintiff requested to use the bathroom and was led there by German. (Pl. Dep. 26). Plaintiff testified that German assaulted him "inside the bathroom of the 1st Precinct" by hitting him multiple times "on the head with a phonebook." (*Id.* at 25-27). According to Plaintiff's testimony, the assault occurred within the first 30 seconds after he entered the bathroom. (*Id.* at 28-29). Plaintiff, who was front-handcuffed at

---

Material Facts ("Def. 56.1" (Dkt. #66)), which is uncontested. For ease of reference, the Court refers to Defendants' brief in support of their motion for summary judgment as "Def. Br." (Dkt. #70). Plaintiff did not submit any opposition briefing.

the time, then fell on his knees to the floor, at which point he was hit again. (*Id.* at 29-30). Plaintiff testified that, following the assault, German picked him up, pushed him against the urinal, told him to use the bathroom, and then stood outside of the bathroom until Plaintiff exited. (*Id.* at 32-32).

### 2. The Second Alleged Excessive Force Incident

Plaintiff testified that, after he returned to the interrogation room with both Defendants and after some time had passed, German grabbed him and pushed him against the wall. (Pl. Dep. 48-49 ("[H]e turned me around and pushed me up against the wall and put his elbow — or his forearm into the back of my neck.")). When Plaintiff attempted to push himself off of the wall, Irizarry grabbed his left arm and began "forcing it to go behind [Plaintiff's] back[.]" (*Id.* at 49). Plaintiff felt pain in his left arm at the time and thereafter. (*Id.* at 52).

### 3. The Third Alleged Excessive Force Incident

Plaintiff testified that Defendants placed handcuffs on him "very, very tight," causing "discoloration and bruising on [his] wrists[.]" (Pl. Dep. 54). Plaintiff responded by cursing. (*Id.* at 55).

### 4. The Post-Incident Events and Communications

After Plaintiff was transferred to the holding cell known as the "bullpen" and calmed down, he began "feeling pain all over the back of [his] neck, [and the] top of [his] head[.]" (Pl. Dep. 51). Plaintiff testified that, while detained, he used his cell phone to call his girlfriend, his grandmother, and his friend Henry. (*Id.* at 68). Plaintiff testified that he told these individuals that he had

3

been arrested and was in need of a lawyer, but that he did not "say what happened" and did not "tell them that [he was] hurt either[.]" (*Id.* at 70). Plaintiff also testified that, after he completed arrest processing at the precinct, German and Irizarry transported him to Manhattan Central Booking, and Plaintiff did not "say anything to them en route[.]" (*Id.* at 76-77).

Plaintiff's mugshots, dated March 26, 2015, show no visible bruises on either the front or the right side of Plaintiff's head. (*See* Dkt. #67, Ex. E). The back and left side of Plaintiff's head and neck are not visible in the photographs. (*See id.*). Plaintiff's videotaped interview from the New York County District Attorney's Office's Early Case Assessment Bureau (or "ECAB") contains no sign of bruising on Plaintiff's head, and no indication that Plaintiff was experiencing physical discomfort. (*See* Dkt. #68, Ex. F). While the video shows the front-left side of Plaintiff's head as he is seated at a table, the video is a relatively low-resolution, grainy image that does not include much detail. (*Id.*).

Plaintiff was released on bail on or about March 31, 2015. (*See* Dkt. #68, Ex. I). Approximately three days later (or nine days after the alleged assault), Plaintiff returned to his job as a fitness trainer, leading fitness classes in "[t]otal body conditioning." (Pl. Dep. 91-92). Plaintiff testified that he led about six to seven classes a week, each of which lasted from 45 minutes to one hour. (*Id.* at 93-94). However, in order not to "exert too much energy from [himself]," he would give a modified demonstration and then "just circulate the room to

make sure everybody's doing what they [are] supposed to do correctly." (*Id.* at 93).

### 5. Plaintiff's Medical Treatment

On March 29, 2015, Plaintiff underwent a medical evaluation as part of the admission intake process for the Manhattan Detention Center ("MDC"). (*See* Dkt. #68, Ex. H at 2).[2] Plaintiff's medical records from that visit indicate that he answered "no" to the question whether he had "ever been assaulted." (*Id.*). In relevant part, the records state: "Past Medical History S/p car accident 02/24/2015 was on ... diazepam for 3 days only." (*Id.*). At the visit, Plaintiff "received Ibuprofen 400 mg PO Stat as per PA orders." (*Id.* at 3). The report described his mood as "euthymic," his head as "normocephalic, atraumatic," and his neck as "supple, no JVD." (*Id.* at 4, 6). His extremities were described

---

2 The medical records supplied by Defendants contain numerous medical abbreviations for which no glossary is provided. From prior cases in this area, the Court understands them to mean the following: "pt" refers to the patient (here, Plaintiff); "s/p" means "status post"; "PO Stat" means that medication was administered orally and during the visit; "JVD" refers to "jugular vein distention," or a bulging neck vein; "NOS" means "not otherwise specified"; "meds" refer to prescription medications; and "RTC" means "return to clinic," here with the qualification "prn," which means "as needed."

The records also contain several medical terms for which definitions are not provided. From the *Merriam-Webster Medical Dictionary*, the Court understands that "euthymic" is defined as "a normal, tranquil mental state or mood"; and "atraumatic" is defined to include "not resulting from injury or trauma." https://www.merriam-webster.com/medical (last visited Mar. 25, 2019). From the *Merriam-Webster Open Dictionary*, the Court understands the term "normocephalic" to include among its definitions "having a head with a normal shape and with organs and functions that appear normal." http://nws.merriam-webster.com/opendictionary/newword_display_alpha.php?letter= N&last=420 (last visited Mar. 25, 2019).

Finally, the records contain several references to codes that, during the relevant time period, were standardized in the *International Statistical Classification of Diseases and Related Health Problems*, which codes are sometimes referred to as "ICD codes." The code 959.2 refers to a shoulder or upper arm injury, while the code 338.11 refers to acute pain due to trauma.

5

as having "no visible deformities, full range of motion." (*Id.* at 5). The report assessments state: "Injury of shoulder and upper arm NOS – 959.2, s/p 2/2015. Pain due to trauma, acute – 338.11. ... Injury of shoulder and upper arm NOS meds order – pt educated – advuse [*sic*] to comply – RTC prn. Pain due to trauma, acute. Start Ibuprofen Tablet, 400 MG, 1 tab, Orally, Twice a Day with stat dose, 5 days[.]" (*Id.* at 6). It is possible, but not certain, that the MDC medical personnel connected the shoulder and upper arm injury, or the acute pain from trauma and resulting five-day Ibuprofen prescription, to the car accident that had occurred approximately one month earlier. As it happens, however, the shoulder and upper arm injury, and the Ibuprofen prescription, are mentioned five pages after the sole mention of the car accident. (*Id.* at 2, 6). For this reason, the Court believes that Defendants' Local Rule 56.1 statement may be too ambitious in stating that Plaintiff "complained of pain to his shoulder and upper arm *as a result of the car accident*[.]" (Def. 56.1 ¶ 61 (emphasis added)).

On May 14, 2015, Plaintiff underwent another medical evaluation, again as part of the admission intake process for the MDC. (*See* Dkt. #68, Ex. H at 8). This time, Plaintiff's medical records indicate that he answered "yes" to the question whether he had "ever been assaulted." (*Id.*). Inexplicably, Defendants' Local Rule 56.1 statement asserts the opposite, stating incorrectly that, at the May 14, 2015 evaluation, Plaintiff "confirmed that he had never been the victim of an assault prior to his intake appointment." (Def. 56.1 ¶ 75).

6

The May 14, 2015 records also clarify in "Past Medical History" that Plaintiff had been "on diazepam for 3 days only due [to] my back pain[.]" (Dkt. #68, Ex. H at 8). This is the first mention of back pain in the medical records.[3] Here, the medical personnel appear to have correlated the back pain with Plaintiff's February 2015 car accident: "Back pain – 724.5 INJURY-NOS – E958.9, s/p car accident[.]" (*Id.* at 12).[4] This report indicates a prescription of both Ibuprofen and Robaxin for the back pain. (*Id.*). The May report contains no mention of the earlier shoulder and upper arm injury. (*Id.*). As with the March report, the May report described Plaintiff's mood as "euthymic," his head as "normocephalic, atraumatic," and his neck as "supple, no JVD." (*Id.* at 10, 12).

On July 17, 2015, Plaintiff had another medical appointment, this time for anxiety. (*See* Dkt. #68, Ex. H at 15). The records from this visit indicate that Plaintiff was in a car accident and "was on diazepam for 3 days only due [to] my back pain[.]" (*Id.*). The records also indicate that Plaintiff was experiencing depression and anxiety approximately two weeks after his arrest, that he had gotten into fights with some other inmates, and that he "was

---

[3]    The March 29, 2015 records contain no mention of back pain (*see* Dkt. #68, Ex. H at 2-7), nor does Defendants' Local Rule 56.1 statement mention back pain in relation to the medical assessment conducted on that date (*see* Def. 56.1 ¶¶ 59-65). Defendants' Local Rule 56.1 statement asserts incorrectly that the May 14, 2015 records "*again* indicated that he had resulting lower back pain from the February, 2015 car accident, and was prescribed diazepam and ibuprofen." (*Id.* at ¶ 74 (emphasis added)).

[4]    ICD code 724.5 pertains to "backache, unspecified," while code E958.9 pertains to self-inflicted injuries, including suicide.

7

tearful talking about his legal problems and his bail being raised." (*Id.* at 22). The report contains no mention of an assault by the police. (*Id.* at 18-24).

During Plaintiff's deposition, he was asked whether, after he was transferred from the MDC to a facility in upstate New York, he "receiv[ed] any sort of medical attention as a result of this arrest, psychologi[cal] or physical?" (Pl. Dep. 102). Plaintiff responded, "Initially I was still — the whole time I was in MDC and up until I got to Fishkill I was still on the medication. On the psych medication." (*Id.*). Plaintiff testified that, as a result of the March 26, 2015 alleged assault, he experienced sporadic "sharp pain that goes from the top of [his] head down the side of [his] neck *on the left side*," as well as restrictions in the mobility of his neck and head. (*Id.* at 106-07 (emphasis added)). Plaintiff testified that he told doctors at Fishkill and at the MDC about the pain and was informed that "it's just something that'll pass. There's no type of definite treatment for a sharp pain that comes in your neck." (*Id.* at 107). Defendants' Local Rule 56.1 statement characterizes this portion of Plaintiff's testimony by asserting: "Plaintiff has not received treatment for physical injuries arising out of this incident while in DOCCS [New York State Department of Corrections and Community Supervision] custody." (Def. 56.1 ¶ 84).

B.  **Procedural Background**

Plaintiff commenced this action on September 15, 2015, alleging that Defendants physically assaulted him, and otherwise violated his constitutional and civil rights, while questioning him at the First Precinct on or about

8

March 26 or 27, 2015. (Dkt. #2). Plaintiff also brought claims for false arrest and malicious prosecution. (*Id.*). On January 11, 2016, the Court granted a stay pending the resolution of Plaintiff's state criminal prosecution. (Dkt. #10). On September 15, 2016, Defendants informed the Court that Plaintiff had entered a guilty plea in the state prosecution on May 3, 2016, and had been sentenced on August 25, 2016. (Dkt. #27). Accordingly, the Court lifted the stay on September 16, 2016. (Dkt. #28).

On November 1, 2016, the Court held a telephonic Initial Pretrial Conference, during which Plaintiff voluntarily dismissed all of his claims in the instant action, except his claims for excessive force under 42 U.S.C. § 1983. (Dkt. #37). Plaintiff filed the operative Amended Complaint on March 31, 2017, alleging that Defendants "physically attacked [him] with Phone Books over the head and body as well as excessive restraints [to] the arms, shoulders, and legs," and seeking damages in the amount of $2 million. (Dkt. #39). Defendants answered on April 28, 2017. (Dkt. #40). On June 14, 2017, the parties stipulated to the dismissal of all of Plaintiff's claims against the City of New York, as well as certain claims against Defendants German and Irizarry. (Dkt. #43).

Following discovery and a telephonic conference held on February 7, 2018, the Court clarified that

> Plaintiff's claims stem from three alleged instances of excessive force. First, Plaintiff alleges that he was beaten in a bathroom at the precinct. Second, Plaintiff alleges he was subject to excessive force during an interview by Defendants. Third, Plaintiff alleges that he

9

was placed in excessively tight handcuffs during his interview.

(Dkt. #59). As Plaintiff conceded that Defendant Irizarry was not involved in the first alleged excessive force incident, the Court dismissed the first claim against Irizarry. (*Id.*). On March 30, 2018, Defendants filed a motion for summary judgment as to the remaining three excessive force claims against Defendant German, and the remaining two excessive force claims against Defendant Irizarry. (Dkt. #64-70). That same day, Defendants served the motion and supporting papers on Plaintiff, along with copies of all unreported cases cited therein. (Dkt. #71). Plaintiff did not file an opposition. Defendants filed a reply on May 29, 2018, seeking dismissal on the basis of Plaintiff's failure to respond. (Dkt. #72). The Court denied Defendants' application, and granted Plaintiff until July 2, 2018, to respond. (Dkt. #73). Plaintiff did not file a response. Accordingly, the Court now decides the motion without the benefit of a response from Plaintiff.

## DISCUSSION

### A. Applicable Law

#### 1. Motions for Summary Judgment Under Rule 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[5]

---

5  The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary

A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

In deciding a motion for summary judgment, "a district court generally 'should not weigh evidence or assess the credibility of witnesses.'" *Rojas* v.

---

judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

11

*Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Hayes* v. *N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). But to that general rule, the Second Circuit has recognized an exception:

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys*, 426 F.3d at 554 (internal citation omitted) (quoting *Anderson*, 477 U.S. at 252). In this rare setting, a court considering a summary judgment motion may make credibility determinations. *SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017). Even then, the Second Circuit has cautioned that, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Jeffreys*, 426 F.3d at 555 n.2 (emphasis and citation omitted). Instead, such credibility assessments are to be reserved for "extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility." *Rojas*, 660 F.3d at 106 (citation and quotation marks omitted). A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Simpson* v. *City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).

### 2. Motions for Summary Judgment in *Pro Se* Cases

In a *pro se* case, the court must take an additional step and liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

This task has been complicated by Plaintiff's noncompliance with Local Rule 56.1. Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement. *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant … pursuant to Rule 56.1(a) … must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Conversely, a non-movant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly supported facts in a Local Rule 56.1 statement are denied with only conclusory assertions, the court will find such facts to be true. *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

"*Pro se* litigants are … not excused from meeting the requirements of Local Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vt. Teddy Bear*, 373 F.3d at 246). Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion "to

13

consider the substance of the plaintiff's arguments." *Id.* (citing *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record."). To be fair to all parties, the Court will rely principally on its own assiduous review of the record.

**B. Analysis**

    **1. Defendants' Motion for Summary Judgment on the First Two Excessive Force Claims Is Denied**

Defendants argue, *first*, that no jury could credit Plaintiff's account of excessive force because his "medical records ... contradict [his claimed] injuries[.]" (Def. Br. 9). Defendants rely on the proposition that, "where undisputed medical records *directly and irrefutably* contradict a plaintiff's description of his injuries, no reasonable jury could credit [the] plaintiff's account of the happening." *Davis* v. *Klein*, No. 11 Civ. 4868 (ENV) 2013 WL 5780475, at *4 (E.D.N.Y. Oct. 25, 2013) (emphasis in original). (*See also* Def. Br. 8-9).

The core weakness in Defendants' argument is that it does not accurately reflect the record. Defendants' briefing asserts, incorrectly, that the medical

14

records "indicate that plaintiff answered that he had never been the victim of an assault." (Def. Br. 10). The briefing omits any mention of the fact that the May 14, 2015 records document that Plaintiff responded "yes" when asked if he had been assaulted. (*See id.*; Dkt. #68, Ex. H at 8).

Moreover, Defendants' briefing refers the Court to its Local Rule 56.1 statement (*see* Def. Br. 10), without acknowledging or correcting that document's erroneous assertion that, at the May 14, 2015 evaluation, Plaintiff "confirmed that he had never been the victim of an assault prior to his intake appointment" (Def. 56.1 ¶ 75). Instead, Defendants' briefing repeats the error by asserting that "Plaintiff's medical screening after his indictment yielded the same results as his first screening" (Def. Br. 10), despite the key difference that at the post-indictment screening Plaintiff indicated that he *had* been assaulted.

Defendants' briefing also asserts that "[t]he only documented claim of pain refers to a car accident … [t]he records … make no mention of any complaints by plaintiff of head or neck trauma." (Def. Br. 10). Of course, the MDC medical personnel at the March 29, 2015 visit were advised by Plaintiff of the car accident, and presumably not of the assault, which would not be documented in a medical report until two months later. It is true that medical personnel indicated that the pain was the result of an acute trauma, and that they suggested a correlation to the car accident by noting "s/p 2/2015," but no definitive causal connection was expressed. (*See* Dkt. #68, Ex. H at 6).

That Plaintiff's March 29, 2015 medical records indicate injury to the shoulder and upper arm, and that Plaintiff's May 14, 2015 medical records

15

indicate that he stated that he had been assaulted, are facts in evidence that support Plaintiff's allegations. Therefore, Defendants' assertions that "there is no objective evidence supporting Plaintiff's claims beyond his own testimony," and that "the only admissible evidence supportive of plaintiff's claims is his own deposition testimony," are overstatements. (*See* Def. Br. 8, 11).

The remainder of Defendants' briefing emphasizes evidence in the record that could support an inference in Defendants' favor. Some of this evidence comes from the medical records, such as that Plaintiff's medical evaluations do not indicate any injuries to Plaintiff's head or neck, or any complaints of such injuries, and further do indicate that plaintiff's head was "normocephalic" and "atraumatic." (Def. Br. 9-10). Defendants reason that these reports directly contradict any "discoloration from the alleged bruising," which Defendants infer "would be clearly pronounced three days after plaintiff's arrest." (*Id.* at 9). Put simply, Defendants' argument rests on the proposition that the absence of mention of head or neck injury in the medical records, combined with the words "normocephalic" and "atraumatic" in those records, directly and irrefutably contradict the allegations that Plaintiff was beaten over the head with a phonebook. But Defendants have submitted no evidence establishing that theirs are the only reasonable inferences to draw from the relevant facts.

For example, Defendants have not established that, were the allegations true, discoloration from bruising would necessarily have been visible on Plaintiff's head three days following the assault. Nor have they submitted evidence that the alleged hitting over the head with a phonebook would

necessarily have produced a head injury that would be mutually exclusive of a medical evaluation of "normocephalic" and "atraumatic." While it is certainly plausible that the alleged hitting over the head with a phonebook could have produced long-lasting bruises, could have altered the shape of Plaintiff's head or the functions of its organs, and could otherwise have left visible marks resulting from injury or trauma, Defendants must establish more than the plausibility of their own interpretation of the evidence for a grant of summary judgment in their favor.

Defendants also spotlight evidence from Plaintiff's arrest records, namely that his mug shots and his video-recorded ECAB interview do not show signs of trauma or bruising. (*See* Def. Br. 10-11). However, the mug shots do not show the left side of Plaintiff's head and neck, which is where Plaintiff testified that he experienced pain. (*See* Pl. Dep. 106-07). The video-recorded interview does show the left side of Plaintiff's head, but in low resolution and without sufficient detail to exclude any possibility of bruising. (*See* Dkt. #68, Ex. F). Nor do Defendants identify any other portion of the factual record that conclusively establishes that Plaintiff's testimony is "contradictory and incomplete[.]" *Jeffreys*, 426 F.3d at 554. That, during transport to Central Booking, Plaintiff said nothing about the assault to Defendants German and Irizarry — the very individuals who allegedly assaulted him — is hardly a surprise; Plaintiff had no need to inform them of the events that had just taken place, and no indication that doing so would assist him in any way. As for the fact that Plaintiff did not say anything about the alleged assault in his phone

calls to his girlfriend, grandmother, and friend, a reasonable inference could be drawn that Plaintiff's silence was due to embarrassment or to a desire not to cause these individuals concern. Finally, the fact that nine days after the alleged assault, Plaintiff began leading daily 45 minute-to-one hour exercise classes in which he provided modified demonstrations before circling the room to observe the class participants' movements does not establish any "discrepancies" in his testimony, *Jeffreys*, 426 F.3d at 555 n.2, much less show an "extraordinary case[], where the facts alleged are so contradictory that doubt is cast upon their plausibility," *Rojas*, 660 F.3d at 106 (internal citation and quotation marks omitted).

In sum, the fact that certain portions of the record do not corroborate Plaintiff's version of events does not negate the fact that other portions of the record do, including Plaintiff's own deposition testimony and certain of his medical records. Defendants' motion for summary judgment on Plaintiff's first two excessive force claims is therefore denied.

### 2. Defendants' Motion for Summary Judgment on the Third Excessive Force Claim Is Granted

"Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Grant* v. *City of New York*, 500 F. Supp. 2d 211, 217 (S.D.N.Y. 2007). "In evaluating the reasonableness of handcuffing, a Court is to consider evidence that: [i] the handcuffs were unreasonably tight; [ii] the defendants ignored the arrestee's pleas that the handcuffs were too tight; and

18

[iii] the degree of injury to the wrists." *Esmont* v. *City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005).

There is no evidence in the record that Plaintiff ever informed Defendants that the handcuffs were too tight, much less evidence that Defendants ignored his pleas. And there is no evidence in the record of any injury, or complaints of injury, to Plaintiff's wrists. Accordingly, Defendants' motion for summary judgment dismissing the third excessive force claim is granted.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate the motion at Docket Entry 64.

The parties are directed to submit a joint letter on or before **April 30, 2019**, indicating their availability for trial on the surviving claims in the second half of 2019. If the parties would prefer first to engage in alternative dispute resolution, such as a mediation or settlement conference, they can advise the Court of that as well.

SO ORDERED.

Dated: March 26, 2019
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge